Charles E. GREEN, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A05–1001–CR–37.

Court of Appeals of Indiana.

Dec. 6, 2010.

Ellen M. O'Connor, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, J.T. Whitehead, Arturo Rodriguez

II, Deputy Attorneys General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### *STATEMENT OF THE CASE*

Appellant–Defendant, Charles E. Green (Green), appeals his conviction for murder, a felony, Ind.Code § 35–42–1–1.[1]

We affirm.

### *ISSUES*

Green raises two issues on appeal, which we restate as:

(1) Whether the State presented sufficient evidence to prove beyond a reasonable doubt that he had committed a murder or was an accomplice to a murder; and

(2) Whether the trial court properly instructed the jury with respect to accomplice liability.

### *FACTS AND PROCEDURAL HISTORY*

In July of 2008, Randi Ellis (Ellis) resided with her mother, Merry Sandlin (Sandlin), and Jenny Matthews (Matthews) on North Drexel Avenue in Indianapolis, Indiana. During that time, Ellis was introduced to James Townsend (Townsend), aka KG, by their mutual friend, Krista Kootz (Kootz). A couple of days after the initial introduction, Kootz, Matthews, and Ellis spent the night together. The next morning, all three left in Kootz' car and went to Townsend's home on South Edmondson to get cocaine. Green was one of the many people staying at Townsend's residence, and he was at the house when the three girls visited Townsend.

On August 4, 2008, Ellis was at her home on North Drexel Avenue with her mother and Matthews. During the afternoon, she left the residence for approximately forty-five minutes. When she returned home, she had Townsend's phone number with her, which she entered into her address book with the reference "KG, sexy ass nigga." (Transcript p. 290). At about 10:30 p.m. that same evening, Ellis received a phone call from Townsend. Five to ten minutes after getting the phone call, Ellis told her mother and Matthews that she was going to the corner of Drexel Avenue and 21st Street, five or six houses further down the street, to meet Townsend. She assured them that she would be back within half an hour. Ellis left on foot, wearing "hot pink pants." (Tr. p. 293).

About an hour later, Ellis had not yet returned home. Matthews retrieved Townsend's cell phone number from Ellis' address book and contacted him. Townsend answered and handed Ellis the phone. Ellis sounded "fine" and told Matthews that she would be home in about thirty minutes. (Tr. p. 297). Forty to sixty minutes after that, when Ellis still had not returned home, Matthews dialed Townsend's number again. Townsend answered and told Matthews that he had dropped Ellis off at "Dan's house." (Tr. p. 299). Matthews became concerned because Ellis didn't know anyone called Dan. Any subsequent phone calls from Matthews to Townsend that night went immediately to voice mail.

During the night of August 4, 2008, Townsend and Green were together. At about 9 p.m. that night and prior to Townsend contacting Ellis, Townsend and Green left the house of Suzanne Edwards

1. We held oral argument in this case on October 20, 2010 at Northwestern High School in Kokomo, Indiana. We thank Northwestern High School for its hospitality in hosting the argument and counsel for both parties for their excellent advocacy.

(Edwards), Townsend's girlfriend, in Edwards' silver Pontiac Bonneville. Townsend and Green returned to Edwards' home together in the middle of the night and spent the night there. The following day, on August 5, 2008, Townsend and Green told Edwards that they had shot somebody. Edwards thought that they were "just playing" but they kept going back and forth on who shot someone. (Tr. p. 600). Green reenacted the shooting, saying "that bitch went like this" and he "made his body fall down on the ground." (Tr. p. 601). Both Green and Townsend acted like shooting someone was a joke and they told Edwards that they would take her to Townsend's house to show her the body. Townsend and Green drove Edwards to Townsend's residence at South Edmondson and showed her Ellis' body which was behind the garage, dressed in pink pants. They returned to Edwards' house where Edwards went to her bedroom and started crying. Green and Townsend left Edwards' house around 8 or 9 p.m., driving Edwards' car.

Around noon on that same day, August 5, 2008, Matthews was able to reach Townsend again by phone. Townsend told her that he had dropped Ellis off at the Skyline Motel on Washington Street with "some dude named Dan or something like that" and then hung up. (Tr. p. 301). At 7 p.m. that night, Sandlin reported her daughter missing and filed a missing person's report. Detective Chester Price (Detective Price), an officer with the missing persons division of the Indianapolis Metropolitan Police Department (IMPD), assumed the lead role in Ellis' disappearance. Sandlin informed him that Ellis was with Townsend the night she disappeared.

At some point during the night of August 5, 2008, police pulled Townsend over for a traffic violation. IMPD Officer Courtney Harris (Officer Harris) noticed that Townsend, who was driving Edwards' car with Green as a passenger, failed to signal and that the license plate light was out. Officer Harris asked both men to identify themselves and they both gave false names. When Officer Harris could not verify their identities, he requested backup, which arrived four to five minutes later. As the Officers approached the car, they asked Townsend to exit the car; however, Green jumped out of the vehicle's passenger side and fled on foot. Officers chased Green. An off-duty IMPD officer Christian Nielsen witnessed the chase and observed that Green was carrying a weapon. He alerted the other Officers of the presence of a firearm. Green attempted to dispose of the firearm during the chase, but the Officers recovered it. They eventually apprehended Green. After the arrest, Townsend contacted Edwards to let her know that he and Green had been pulled over in her car by the police and had been arrested.

Later that same night, while Townsend and Green were in jail, Edwards told Townsend's sister, Anise Carter (Carter), about the body at Townsend's house. Carter immediately called their father, James Townsend Sr. (Townsend Sr.). All three went over to Townsend's house on South Edmondson. At the residence, Edwards backed the car up to the garage, Carter and her father wrapped Ellis' body in a shower curtain from Townsend's home and placed the body in the trunk of the car. Townsend Sr. gave Edwards directions as to where to drive to and they eventually ended up at an abandoned house where Townsend Sr. and Carter threw the body in a nearby creek.

Ellis' body was discovered two weeks later on August 19, 2008. Michael Ellyson, crew chief of mosquito control with the Marion County Health Department, was checking on a complaint about a mos-

quito infestation at a creek near a property at 5015 Banbury. When he looked around the creek, he spotted a badly decomposed body, dressed in a pair of pink pants, face down and both of her arms over her head.

After the police arrived and had secured the scene, they discovered a shower curtain upstream. The shower curtain would later be identified as Townsend's shower curtain. Sandlin identified the body as Ellis' based on the clothing and tattoo. The autopsy revealed the cause of death to be a gunshot wound to the back of Ellis' head. A fragment of a bullet jacked was recovered from her right temple. Firearms examiners compared it to the weapon that was possessed by and discarded by Green and determined that Green's weapon had been used to shoot Ellis.

On November 10, 2008, the Marion County grand jury indicted both Green and Townsend on a count of murder, a felony, I.C. § 35–42–1–1. On May 7, 2009, Green filed a motion for separate trial, which was granted by the trial court on August 19, 2009. On November 16–19, 2009, a jury trial was held. At the close of the evidence, the jury found Green guilty as charged. On December 23, 2009, during a sentencing hearing, the trial court sentenced Green to fifty-five years at the Department of Correction.

Green now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Sufficiency of the Evidence

Green asserts that the State failed to present sufficient evidence to sustain his murder conviction, either as the principal or as an accomplice with Townsend. In reviewing a sufficiency of the evidence claim, this court does not reweigh the evidence or judge the credibility of the witnesses. *Perez v. State*, 872 N.E.2d 208, 212–13 (Ind.Ct.App.2007), *trans. denied.* We will consider only the evidence most favorable to the verdict and the reasonable inferences to be drawn therefrom and will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the judgment. *Id.* at 213. Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense. *Id.*

In order to convict Green of murder, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally killed Ellis. *See* I.C. § 35–42–1–1. To convict Green as an accomplice, the State was required to prove beyond a reasonable doubt that Green knowingly or intentionally aided, induced, or caused another person (here, Townsend) to murder Ellis. *See* I.C. § 35–41–2–4. It is well established that a person who aids another in committing a crime is just as guilty as the actual perpetrator. *Vandivier v. State*, 822 N.E.2d 1047, 1054 (Ind.Ct. App.2005), *trans. denied.* To be convicted as an accomplice, it is not necessary for a defendant to have participated in every element of the crime. *Bruno v. State*, 774 N.E.2d 880, 882 (Ind.2002), *reh'g denied.* While mere presence at the scene of the crime is insufficient to establish accomplice liability, presence may be considered along with the defendant's relation to the one engaged in the crime and the defendant's actions before, during, and after the commission of the crime. *Alvies v. State*, 905 N.E.2d 57, 61 (Ind.Ct.App.2009).

In the case before us, the State presented evidence that Green lived with Townsend in his house on South Edmondson and was present when Kootz, Matthews, and Ellis visited in July of 2008. The State also established that during the night of August 4, 2008, the night of Ellis' murder, Green and Townsend were togeth-

er. At about 9 p.m. that night, Green and Townsend left Edwards' house together, driving Edwards' car. Around 10:30 p.m., Townsend phoned Ellis and five to ten minutes after receiving the call Ellis told her mother and Matthews that she was going to the corner of the street to meet Townsend. She assured them that she would be back within half an hour. When she failed to return, Matthews contacted Townsend. Townsend answered and handed Ellis the phone; Ellis told Matthews that she would be home within thirty minutes. This was the last conversation Ellis had with her family or friends. Later that night, Townsend and Green returned together to Edwards' residence.

The following day, on August 5, 2008, Townsend and Green informed Edwards that they had killed somebody. Despite the fact that Edwards believed that they were "just playing," Green and Townsend kept going back and forth on who "shot somebody." (Tr. p. 600). Trying to convince Edwards, Green reenacted the shooting, telling her "that bitch went like this" and he "made his body fall down on the ground." (Tr. p. 601). Green and Townsend then drove Edwards to Townsend's residence where she saw Ellis' body laying behind the garage.

Later that night, police pulled Townsend over for a traffic violation. Townsend was driving Edwards' car with Green as a passenger. When the Officers asked Townsend to exit the car, Green jumped out of the vehicle's passenger side and fled on foot. While he was being chased by the Officers, Green attempted to dispose of a firearm. Eventually, the Officers apprehended Green and retrieved the weapon. Testing on the firearm revealed that this weapon had been used to shoot Ellis.

Based on this evidence, the trier of fact could reasonably infer that Green murdered Ellis, or, at the very least that he aided, induced, or caused Townsend to murder her. The State established that Green and Townsend were together before and after Ellis' murder. In addition, Green reenacted the shooting for Edwards; he clearly did not oppose the crime but instead joked about it with Townsend, each assigning the other the role of principal. Moreover, Green had the murder weapon in his possession when he fled from the police. As a result, we find that the State presented sufficient evidence to support Green's conviction.

## II. *Jury Instruction*

 Green next contends that the trial court improperly instructed the jury. Specifically, Green claims that Jury Instruction 21(F) regarding accomplice liability was confusing and misleading. It is well established by our court that instructing the jury is within the discretion of the trial court. *White v. State,* 846 N.E.2d 1026, 1032 (Ind.Ct.App.2006), *trans. denied.* Jury instructions are to be considered as a whole and in reference to each other; error in a particular instruction will not result in reversal unless the entire jury charge misleads the jury as to the law in the case. *Id.*

Final Jury Instruction 21(F) read as follows:

Mere presence at the scene of the crime, coupled with knowledge that a crime is being committed is insufficient to establish guilt. Further acquiescence in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding, inducing, or causing a crime.

To convict a Defendant because he aided, induced or caused a crime, you must find, beyond a reasonable doubt, that he knowingly or intentionally participated in some conduct of an affirmative nature.

A person who knowingly or intentionally aids, induces, or causes another per-

son to commit an offense, commits that offense, even if the other person:

1. Has not been prosecuted for the offense;

2. Has not been convicted of the offense; or

3. Has been acquitted of the offense.

There is no distinction between the criminal responsibility of a principal and that of an accomplice.

To convict a defendant of any crime on an accomplice theory, that is aiding, inducing, or causing a crime, the State must prove beyond a reasonable doubt that the defendant intended by his own voluntary conduct to cause or facilitate commission of the particular crime committed by the principal offender.

A person is responsible for the actions of another person when, either before or during the commission of a crime, he knowingly aids, induces, or causes the other person to commit a crime. To aid is to knowingly support, help, or assist in the commission of a crime.

In order to be held responsible for the actions of another, he need only have knowledge that he is helping in the commission of a crime. He does not have to personally participate in the crime nor does he have to be present when the crime is committed.

Proof of a defendant's failure to oppose the commission of a crime, companionship with the person committing the offense, *and conduct before and after the offense may be considered in determining whether aiding may be inferred.* (Appellant's App. pp. 324–25) (emphasis added).

In determining whether there was sufficient evidence for purposes of accomplice liability, we consider such factors as: (1) presence at the scene of the crime; (2) companionship with another at the scene of the crime; (3) failure to oppose commission of crime; and (4) course of conduct before, during, and after concurrence of crime. *Bruno,* 774 N.E.2d at 882.

Referencing the final paragraph of the jury instruction, Green contends that the instruction was faulty as it "advises the jury that certain facts may be considered in determining guilt without explicitly setting forth what must be proved." (Appellant's Br. p. 14). During oral argument, Green's counsel clarified this argument and explained that because the final paragraph only focuses on a defendant's actions before and after the offense, but not his actions *during* the offense, it placed undo emphasis on Green's fleeing from the police while carrying a gun that had been used in Ellis' murder. Green claims that the jury could have focused on these two elements, which occurred after the murder, as proof that Green aided in the commission of the crime.

■■■ The courts of this State have long disapproved of instructions that unduly emphasize one particular evidentiary fact, witness, or phase of the crime. *Fowler v. State,* 900 N.E.2d 770, 773 (Ind.Ct. App.2009). In fact, an accomplice liability instruction that "draws the focus of the jury away from the *total circumstances* showing that defendant's knowledge and conduct" is improper. *Boney v. State,* 880 N.E.2d 279, 293 (Ind.Ct.App.2008), *trans. denied* (citing *Peterson v. State,* 699 N.E.2d 701, 706 (Ind.Ct.App.1998)) (emphasis added). The jury must be instructed that accomplice liability requires proof that the defendant engaged in voluntary conduct in concert with his accomplice. *Boney,* 880 N.E.2d at 293. To be convicted as an accomplice, it is not necessary for a defendant to have participated in every element of the crime. *Bruno,* 774 N.E.2d at 882. A defendant may be convicted as an accomplice where he merely had a tangential involvement in the crime. *Ajabu v. State,* 693 N.E.2d 921, 937 (Ind.1998), *reh'g denied.*

While we agree that the final paragraph of the jury instruction fails to take into account the total circumstances as it lacks to mention Green's actions *during* the crime; however, read in conjunction with the other paragraphs we cannot say that the jury was mislead. The first paragraph clearly instructs the jury that mere presence, coupled with knowledge that a crime is being committed is not sufficient to establish guilt. Rather, the second paragraph elaborates that to convict Green as an accomplice, the jury had to find that he knowingly or intentionally participated in some conduct of an affirmative nature. Even more plainly, the sixth paragraph explicitly states that an accomplice is a person who either before or during the commission of a crime, knowingly aids, induces, or causes another person to commit a crime.

Thus, although the final paragraph omitted to instruct the jury that it could consider Green's conduct during the offense, Jury Instruction 21(F) in its entirety clearly advised the jury that in order to find Green guilty as an accomplice, they needed to find that he knowingly aided Townsend to commit Ellis' murder. Therefore, we cannot say that the Jury Instruction 21(F) as a whole was misleading.

### CONCLUSION

Based on the foregoing, we conclude that the State presented sufficient evidence beyond a reasonable doubt to support Green's conviction and the trial court did not abuse its discretion when it instructed the jury on accomplice liability.

Affirmed.

ROBB, J., and BRADFORD, J., concur.