## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Feb 19 2016, 6:04 am
CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Frederick Vaiana<br>Indianapolis, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana<br><br>J.T. Whitehead<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michelle Williams,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | February 19, 2016<br><br>Court of Appeals Case No.<br>49A05-1505-CR-388<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Mark Stoner, Judge<br><br>The Honorable Jeffrey Marchal, Commissioner<br><br>Trial Court Cause No.<br>49G06-1311-MR-071046 |

**Altice, Judge.**

**Case Summary**

[1] Following a jury trial, Michelle Williams was convicted of Murder, a felony,[1] and Conspiracy to Commit Robbery, a Class B felony.[2] Williams presents one issue for our review: Did the trial court abuse its discretion in rejecting Williams's tendered final instruction regarding accomplice liability?

[2] We affirm.

## Facts & Procedural History

[3] Around 6:20 p.m. on October 19, 2013, David Williamson had his father drop him off at Donny Bell's apartment located in Indianapolis. Bell was Williamson's cousin and he had agreed to let Williamson move in with him. Bell returned to his apartment just before 8:00 p.m. that evening and noted that the front door was unlocked. There was no sign of forced entry. Bell entered his apartment and discovered that it had been ransacked—furniture had been turned over and torn up, cabinets and drawers were open throughout, his mattress had been moved, and the door to his safe was open. Bell walked through the apartment and found Williamson unresponsive and lying in a pool of blood on the bathroom floor. Bell called 911. Williamson died as a result of a gunshot to the back of the head.

---

[1] Ind. Code § 35-42-1-1(2) (felony murder).

[2] Ind. Code § 35-41-5-2 (conspiracy); I.C. § 35-42-5-1 (robbery). Effective July 1, 2014, this offense was reclassified as a Level 2 felony. Because Williams committed this offense prior to that date, it retains its prior classification as a Class B felony.

[4] Earlier in the evening, Bell had received a series of text messages from Williams. Bell owned a tire shop and had a business driving an ice cream truck. Bell also earned a living selling drugs, principally marijuana and methamphetamine. Bell was introduced to Williams three to four months prior and had supplied her with drugs. Williams knew that Bell would on occasion have large sums of money and/or drugs in the safe located in his apartment.

[5] Williams sent the first text message around 6:16 p.m. stating that she had money for him. At 6:19 p.m. Williams sent a second text to Bell indicating that she was approximately five minutes away from his apartment. Bell received a third text message from Williams at 6:32 p.m. in which Williams said she had come to see him and asked Bell to "hit her right back." *Transcript* at 64. Bell received yet another message from Williams at 7:51 p.m. saying that she needed "a basket or two," which Bell explained was a reference to "[a] ball of dope, crystal methamphetamines." *Id.* at 65. Bell did not respond to any of the text messages because he did not see them until much later that night when he was talking to a detective who had come to his apartment to investigate the shooting.

[6] Within the same timeframe as Williams's texts, Bell also received a text message at 7:07 p.m. from Williamson stating, "Hey chelles here wnten a twenty call me cuz k bub." *State's Exhibit No.* 34. Bell testified that he did not know anyone by the name of "chelles" but assumed Williamson was referring to "Michelle" Williams, the defendant. *Transcript* at 75, 76. A few days later, Bell discovered that he had received a voice message from Williamson at 7:09

p.m. on October 19. Bell recognized Williamson's voice and heard Williams talking in the background, saying "[w]e've got something for him." *Id.* at 80. After a short pause, Bell also heard another man's voice on the voice message. Bell shared this information with the investigating detective.

[7] On October 19, Williams and her boyfriend, Chris West, were staying with Tabitha Dickman. Dickman testified that she overheard Williams and West talking about "hitting a lick" and how easy it would be. *Id.* at 172. Dickman also heard Williams mention someone by the name of "Don." *Id.* After this conversation, Williams and West left, and Dickman fell asleep. Later that evening, Dickman was awakened when Williams and West came back to the home. Dickman overheard them talking about what "had went wrong" and that they also talked about a safe. *Id.* at 161. She also overheard Williams tell West to "take a shower" and "to calm down" and to "[w]ash the GSR off your hands." *Id.* at 166-67. As to their demeanor, Dickman noted that Williams and West were "[r]eal nervous and frantic, sweaty, like they done something." *Id.* at 166.

[8] On November 1, 2013, the State charged Williams with murder, in two separate counts. In Count I, the State alleged a knowing killing. I.C. § 35-42-1-1(1). In Count II, the State alleged a felony murder, i.e., a killing in the course of a robbery. I.C. § 35-42-1-1(2). The State also charged Williams with attempted robbery as a Class A felony, conspiracy to commit robbery as a Class A felony, and criminal confinement as a Class B felony. A jury trial was held on April 1 and 2, 2015. At the conclusion of the evidence, the trial court

granted Williams's motion for a directed verdict on the criminal confinement charge, which was ultimately dismissed. The jury found Williams not guilty with regard to Count I, but returned guilty verdicts for felony murder, attempted robbery, and conspiracy to commit robbery. At a May 5, 2015 sentencing hearing, the trial court elected not to enter a judgment of conviction for attempted robbery based on double jeopardy concerns. The trial court entered convictions for felony murder and conspiracy to commit robbery and sentenced Williams to an aggregate sentence of fifty-eight years.

**Discussion & Decision**

[9] Williams argues that the trial court erred in failing to give her tendered final jury instruction regarding accomplice liability. At the conclusion of the evidence, Williams tendered the following proposed jury instruction on accomplice liability:

> You must not convict the accused of aiding, inducing, or causing an offense unless you find beyond a reasonable doubt that the accused knowingly or intentionally participated in some conduct of an affirmative nature.
>
> *Green v. State*, 937 N.E.2d 923 (Ind. Ct. App. 2010).

*Appellant's Appendix* at 88.

[10] The trial court declined to give Williams's tendered instruction, finding that the court's final instruction on accomplice liability was an accurate statement of the

law and adequately covered that issue. The trial court's Final Instruction 11, which was read to the jury, provided:

> Mere presence at the scene of the crime, coupled with knowledge that a crime is being committed is insufficient to establish guilt. Further acquiescence in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding, inducing, or causing a crime.
>
> To convict . . . a defendant of any crime on an accomplice theory, that is aiding, inducing, or causing a crime, the State must prove beyond a reasonable doubt that the defendant intended by her own voluntary conduct to cause or facilitate commission of the particular crime committed by the principal offender.
>
> Proof of a defendant's failure to oppose the commission of a crime, companionship with the person committing the offense, and conduct before, during, and after the offense may be considered in determining whether aiding may be inferred.

*Id*. at 102. Although Williams concedes that the trial court's instruction was "accurate," she nevertheless argues that it is an incomplete statement of the law. *Appellant's Brief* at 8.

[11]     The purpose of jury instructions is "'to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict.'" *Gravens v. State*, 836 N.E.2d 490, 493 (Ind. Ct. App. 2005) (quoting *Overstreet v. State*, 783 N.E.2d 1140, 1163 (Ind. 2003)), *trans. denied*. The manner of instructing a jury lies

largely within the sound discretion of the trial court, and we review the trial court's decision only for an abuse of that discretion. *Powell v. State,* 769 N.E.2d 1128, 1132 (Ind. 2002). In reviewing a challenge to a jury instruction, we consider: (1) whether the instruction is a correct statement of the law; (2) whether there was evidence in the record to support giving the instruction; and (3) whether the substance of the instruction is covered by other instructions given by the court. *Hubbard v. State,* 742 N.E.2d 919, 921 (Ind. 2001).

[12] In addition, in order to obtain reversal, a defendant must demonstrate that the trial court's decisions regarding jury instructions prejudiced his substantial rights. *Townsend v. State*, 934 N.E.2d 118, 127 (Ind. Ct. App. 2010) (quoting *Filice v. State*, 886 N.E.2d 24, 37 (Ind. Ct. App. 2008), *trans. denied*), *trans. denied*. Jury instructions are not to be considered in isolation, but as a whole and with reference to each other. *Peterson v. State*, 699 N.E.2d 701, 706 (Ind. Ct. App. 1998). Therefore, an error in the instructions does not constitute reversible error unless the charge to the jury as a whole misstates the law or otherwise misleads the jury. *Id*.

[13] Williams asserts that "a successful prosecution of accomplice liability theory must be supported by conduct of an affirmative nature." *Appellant's Brief* at 7. Williams maintains that the trial court's Final Instruction 11 on accomplice liability informed the jury that Williams had to engage only in voluntary conduct, which she claims falls short of requiring a showing of affirmative conduct on Williams's part in the commission of the crime.

[14] It has long been the case that the jury must be instructed that accomplice liability requires proof that the defendant engaged in *voluntary* conduct in concert with his accomplice. *Carter v. State*, 766 N.E.2d 377, 383 (Ind. 2002) (citing *Small v. State*, 531 N.E.2d 498, 499 (Ind. 1988)) (emphasis supplied). Further, we have found no case law indicating that a showing of "affirmative" conduct is required to establish accomplice liability or explaining that there is a difference between affirmative conduct and voluntary conduct.[3] We therefore conclude that the trial court correctly instructed the jury on accomplice liability and did not abuse its discretion when it declined to use Williams's tendered instruction on the same.

[15] Judgment affirmed.

[16] Robb, J. and Barnes, J., concur.

---

[3] Williams cited to *Green* as support for her tendered instruction setting forth the notion that accomplice liability required "conduct of an affirmative nature." *Appellant's Appendix* at 88. While the accomplice liability instruction given in that case referenced "conduct of an *affirmative* nature," it also informed the jury that the defendant must have intended to cause or facilitate the particular crime by "his own *voluntary* conduct." *Green*, 937 N.E.2d at 928, 929 (emphasis supplied). In any event, the issue addressed on appeal did not concern use of these terms and does not support Williams's claim that the instruction given here was an incomplete statement of the law.